**Binder Malter Harris & Rome-Banks LLP**
Jule H. Rome-Banks #142364
Reno Fernandez #251934
490 Chadbourne Road, Suite A137
Fairfield, CA 94534
(408) 295-1700
julie@bindermalter.com
reno@bindermalter.com

Proposed Attorneys for Debtor in Possession,
Mare Island Dry Dock, LLC

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF CALIFORNIA
# SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No. 26-20777-B-11 |
| MARE ISLAND DRY DOCK, LLC, | Chapter 11 |
| Debtor. | DCN: BM-8 |
| | Date: TBD |
| | Time: TBD |
| | Dept.: B |
| | Place: 501 I Street, 6th Floor, Courtroom 32         Sacramento, California |
| | Honorable Christopher D. Jaime |

## DEBTOR'S EMERGENCY MOTION TO DETERMINE SCOPE OF AND ENFORCE AUTOMATIC STAY AS TO LEASE

COMES NOW Mare Island Dry Dock, LLC, Debtor in Possession herein, moving, on an emergency basis, for entry of an order determining that the automatic stay applies to the Debtor's leasehold interest, described below, and enforcing the automatic stay as to such leasehold interest, pursuant to Bankruptcy Code §§ 105(a) and 362(a)(3), and respectfully represents as follows:

### JURISDICTION AND VENUE

1. This case was commenced by the Debtor filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 14, 2026 (the "Petition Date"). A trustee has not

been appointed, and the Debtor is in possession of its estate.  The Debtor continues to operate its business pursuant to Bankruptcy Code § 1107 and 1108.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1134(a), (b), and (e)(1), and General Order No. 223 of the United States District Court for the Eastern District of California.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

4. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

5. The Debtor consents to the Court's entry of final orders and judgments in connection with this motion.

**FACTS**

6. The Debtor has operated a shipyard on Mare Island in Vallejo, California, since 2013. The shipyard was part of the first United States Navy base established on the Pacific Ocean in 1854. The shipyard become dormant after the base was closed in 1996, but the Debtor revived it.  (See the *Declaration of Harry Nicholsen in Support of Debtor's Emergency Motion to Dete*

7. *ine Scope of and Enforce Automatic Stay as to Lease*, filed herewith (the "Nicholsen Declaration"), ¶ 2.)

8. For the past twelve years, the Debtor has run a thriving shipyard, repairing and maintaining ships for the United States Coast Guard, Military Sealift Command (MSC), the National Oceanic and Atmospheric Administration (NOAA), and commercial vessels.  The Debtor has been a valuable asset to the community, providing thousands of jobs and voluminous trade with local businesses.  (Nicholsen Declaration, ¶ 3.)

9. The Debtor operates dry docks located at 1180 Nimitz Avenue in Vallejo, California (the "Real Property").  The Real Property is adjacent to the Napa River, which separates Mare Island from the rest of Vallejo, California, just south of where the Napa River opens into San Pablo Bay. (Nicholsen Declaration, ¶ 4.)

10. The Debtor leases (the "Lease") the Real Property from Nimitz Group, LLC dba The Mare Island Company (the "Landlord").  A copy of the underlying lease agreement, with amendments (the "Lease Agreement"), is submitted as **Exhibit A** to the Nicholsen Declaration.  (Nicholsen

Declaration, ¶ 5.)

11. All of the Real Property is above water, and none of it is underwater. A site map showing the extent of the Real Property, which is entirely within the area delineated by dash marks, is submitted as **Exhibit B** to the Nicholsen Declaration. Neither the Debtor nor the Landlord holds any interest in any real property under water in the vicinity of the Debtor's dry docks. (Nicholsen Declaration, ¶¶ 6, 8.)

12. The submerged land beyond the end of the Debtor's dry docks is owned by the United States Navy. This stretch of riverbed requires periodic maintenance dredging. (Nicholsen Declaration, ¶ 9.)

13. On November 30, 2021, the Navy granted the Debtor a license to enter upon its submerged lands for the purposes of dredging. See the *License for Nonfederal Use of Department of the Navy Real Property* (the "License"), a copy of which is submitted as **Exhibit C** to the Nicholsen Declaration. Paragraph 4 of Exhibit B to the License provides, in pertinent part, that: "This license does not grant exclusive use or control of the licensed premises and grants no interest in the real property of the Licensor."

14. Lind Marine, LLC, is the Debtor's immediate neighbor on the south side of the Real Property. On or about August 6, 2025, the Debtor hired Lind Marine to perform maintenance dredging of the submerged land beyond the end of the Debtor's dry docks. See the purchase order dated August 6, 2025, a copy of which is submitted as **Exhibit D** to the Nicholsen Declaration. The purchase order comprises the contract between the Debtor and Lind Marine with respect to this project (the "First Project").

15. Lind Marine completed the First Project some time before August 14, 2025. On or about August 14, 2025, Lind Marine issued an invoice (No. 122782) for the entire price of the First Project in the amount of $412,186.50 (the "First Invoice"), a copy of which is submitted as **Exhibit E** to the Nicholsen Declaration. The Debtor has received no further invoices related to the First Project. (Nicholsen Declaration, ¶ 12.)

16. On or about November 24, 2025, the Debtor again hired Lind Marine to perform maintenance dredging of the submerged land beyond the end of the Debtor's dry docks. See the

purchase order dated November 24, 2025, a copy of which is submitted as **Exhibit F** to the Nicholsen Declaration. The purchase order comprises the contract between the Debtor and Lind Marine with respect to this project (the "Second Project").

17. Lind Marine contends that it completed the Second Project on December 4, 2025. On or about December 15, 2025, Lind Marine issued an invoice (No. 128220) for the price of the Second Project in the amount of $340,151.25, (the "Second Invoice") a copy of which is submitted as **Exhibit G** to the Nicholsen Declaration. The total amount of both invoices is $752,337.7

18. In performing both the First Project and the Second Project, Lind Marine generally accessed the submerged lands via its own neighboring premises or some other place. Lind Marine did not enter upon or use any of the Debtor's premises to perform the dredging work. (Nicholsen Declaration, ¶ 15.)

19. This bankruptcy case ultimately stems from a major contract being unexpectedly awarded to a higher bidder. For twelve years, the Debtor won contracts to maintain and repair the two United States Coast Guard Ice Breakers: the USCGC *Healy* and the USCGC *Polar Star*. The *Polar Star* docked at the Debtor's facility for repairs approximately ten times in the last twelve years. In November, 2025, the Debtor was the lowest bidder for the *Healy's* next round of maintenance and repair. However, the Coast Guard awarded the contract to a higher bidder, namely Vigor Marine in Portland, Oregon. (Nicholsen Declaration, ¶ 16.)

20. The contract was not awarded to a higher bidder because of any deficiency in the quality or timeliness of the Debtor's work, for which the Debtor has an excellent track record. On the contrary, the contract was awarded to Vigor because of its location only a car's ride away from Seattle, Washington, where a majority of the *Healy*'s crew is based. (See the *Declaration of Steven DiLeo in Support of Debtor's Emergency Motion to Determine Scope of and Enforce Automatic Stay as to Lease*, filed herewith (the "DiLeo Declaration"), ¶ 3.)

21. The Coast Guard awarding the contract to a higher bidder triggered a round of layoffs in December, 2025. Community leaders reacted to the layoffs with expressions of support, including by Congressman John Garamendi and Vallejo's Mayor Andrea Sorce. (See, e.g., the letter from Congressman Garamendi and several other congresspeople to Coast Guard Admiral Kevin E. Lunday

submitted as **Exhibit H** to the Nicholsen Declaration.) Nevertheless, the Coast Guard declined to reverse its decision. (Nicholsen Declaration, ¶ 17.)

22. The layoffs and resulting publicity generated significant interest among potential buyers. Following the layoffs, the Debtor explored a sale of its business as a going concern, and the Debtor engaged in productive discussions with several potential buyers. The Debtor is currently in the midst of negotiations with a potential buyer on terms that are expected to pay all claims in full and to keep the shipyard operating. Post-petition, the Debtor intends to complete negotiations and sell its business, subject to Court approval. (Nicholsen Declaration, ¶ 18.)

23. On January 16, 2026, Lind Marine recorded a *Claim of Mechanics Lien* in the official records of the County of Solano, California, as Document No. 202600002568 (the "Mechanics Lien"), purporting to encumber the Real Property. A copy of the Mechanics Lien is submitted as **Exhibit A** to the *Request for Judicial Notice and Declaration in Support of Debtor's Emergency Motion to Determine Scope of and Enforce Automatic Stay as to Lease*, filed herewith (the "RJN"). The indebtedness alleged in the Mechanics Lien is $752,337.75, i.e. the sum of the invoices for the First Project and the Second Project. The Debtor first learned of the Mechanics Lien when a copy was received by mail on January 26, 2026. (Nicholsen Declaration, ¶ 19.)

24. The Debtor contends that the Mechanics Lien is defective and does not encumber the Landlord's interest in the Real Property. The Debtor informed the Landlord of said contentions. On more than one occasion, including on January 28, 2026, the Landlord orally assured the Debtor that the Mechanics Lien would not be a problem. (DiLeo Declaration, ¶ 4.)

25. On January 27, 2026, the Debtor paid, and the Landlord accepted, rent for the month of February, 2026. See the wire transfer confirmation submitted as **Exhibit I** to the Nicholsen Declaration. The Landlord accepted the rent without protest and has not attempted to return any portion of the rent. (Nicholsen Declaration, ¶ 21.)

26. On February 9, 2026, the Landlord served a notice of default upon the Debtor, alleging that Lind Marine's filing of the Mechanics Lien was a non-monetary default (the "Notice of Default"). A copy of the Notice of Default is submitted as **Exhibit J** to the Nicholsen Declaration.

27. On the same date (February 9, 2026), the Landlord served a notice of termination,

purporting to immediately terminate the lease solely on the basis of the covenant default (the "Notice of Termination"). A copy of the Notice of Termination is submitted as **Exhibit K** to the Nicholsen Declaration.

28. No opportunity to cure was provided. The three-day notice required by California Code of Civil Procedure § 1161(3) was not issued or delivered to the Debtor. (Nicholsen Declaration, ¶ 24.)

29. This case was commenced before the five-day period for notice and opportunity to cure a non-monetary default required under Paragraph 23.1(c) of the Lease Agreement elapsed.

30. Following commencement of this case, the Landlord has acted as if the Lease were terminated pre-petition. First, at the hearings on the Debtor's first-day motions on February 19, 2026, counsel for the Landlord informed the Court that the Landlord contends the Lease was terminated pre-petition and intends to bring a motion for relief from the automatic stay. (See the *Declaration of Reno Fernandez in Support of Debtor's Emergency Motion to Determine Scope of and Enforce Automatic Stay as to Lease*, filed herewith (the "Fernandez Declaration"), ¶ 2.) However, a motion for relief from the automatic stay has not been filed.

31. Second, the Debtor is informed and believes that the Landlord has been in contact with the most promising potential buyer and has represented to the buyer that the Lease has been irredeemably terminated. (DiLeo Declaration, ¶ 5.)

32. Now, the buyer hesitates to conclude negotiations and proceed with a sale unless and until the Court determines whether or not the Lease has been terminated and cannot be redeemed. As shown in the cash collateral budget submitted as **Exhibit A** to the *Notice of Revised Proposed Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection* [Dkt. #32] (approved on an interim basis by order entered on February 20, 2026 [Dkt. #35]), the Debtor has a reasonable but limited and shrinking window of opportunity to achieve a sale without significant new financing.

33. Third, and finally, on February 27, 2026, the Landlord attempted to return the Debtor's timely-paid rent for March, 2026, on the basis of the Landlord's contention that the Lease has been terminated. See the letter from the Landlord's counsel submitted as **Exhibit A** to the Fernandez Declaration.

34. Such conduct is inconsistent with the Lease's continued effectiveness, its status as property of the estate, and the automatic stay. 11 U.S.C. § 362(a)(3).

35. In light of the foregoing, the Motion seeks a determination that the automatic stay applies to the Debtor's interest in the Lease and entry of an order enforcing the automatic stay to prevent the Landlord from continuing to act as if the Lease were terminated.

36. The Mechanics Lien does not affect the Landlord's property, and there is no material breach to support termination of the Lease.

37. A mechanics lien is not available for dredging a riverbed, as performed in the First Project and the Second Project, because it does not create a permanent work of improvement or add lasting value to the land.

38. In fact, the Debtor must dredge same stretch of riverbed two to four times per year. (Nicholsen Declaration, ¶ 25.)

39. The dredging occurred entirely underwater, upon submerged lands in which neither the Debtor nor the Landlord hold any interest. (Nicholsen Declaration, ¶ 26.)

40. The Real Property is not necessary for use of the dredged submerged land. The Debtor's dry docks are not required for the convenient use and occupation of the stretch of river overlaying the submerged land. Indeed, ships and watercraft traverse this stretch of river several times a day without interacting with the dry docks. (Nicholsen Declaration, ¶ 27.)

41. Because the submerged land is owned by the Navy, California's mechanics lien statute does not apply.

42. The Debtor is informed and believes that Lind Marine did not provide the required pre-lien notice required under California Civil Code §§ 8200(a)(1) and 8410 to the Landlord. (Nicholsen Declaration, ¶ 28.)

43. The Mechanics Lien is untimely. Specifically, the Mechanics Lien includes the First Project, but it was recorded 155 days after the project was completed.

44. Because the Mechanics Lien does not affect the Landlord's interest in the Real Property, it does not cause any substantial harm to the Landlord, and it does not give rise to a material breach of the Lease Agreement sufficient to support termination.

45. The Landlord waived its right to terminate the Lease expressly by orally assuring the Debtor that the Mechanics Lien would not be a problem, as mentioned above.

46. The Landlord waived its right to terminate the Lease by conduct inconsistent with termination by accepting full rent for February, 2026, as mentioned above.

47. Such oral assurance and acceptance of rent also waived any anti-waiver clauses of the Lease Agreement.

48. By failing to give the three-day notice required by California Code of Civil Procedure § 1161(3), and by providing no notice period or opportunity cure, the Landlord failed to satisfy the minimum statutory prerequisites for lease termination.

49. The language of the Lease Agreement, including Paragraph 23.1, does not effectively waive the minimum notice period required by California Code of Civil Procedure § 1161(3).

50. The language of the Lease Agreement, including Paragraph 23.1, does not effectively waive all notice or reduce the minimum notice period to zero.

51. Paragraph 23.1(c) of the Lease Agreement requires the Landlord to provide five days' notice and opportunity to cure a non-payment covenant default or thirty days' notice if more than five days is reasonably necessary to effectuate cure and efforts to cure have begun.

52. If the Lease was terminated (and it was not), the Debtor is entitled to relief from forfeiture and redemption of the Lease pursuant to California Code of Civil Procedure § 1179 and California Civil Code § 3275.

53. Termination of the Lease would be ruinous to the Debtor, the estate, and creditors, as it would effectively prevent a sale of the Debtor's business as a going concern. Without the Lease, the value of the Debtor's assets is insufficient to pay claims in full, as would be the case in a sale.

54. Moreover, there is no indication of any harm to the Landlord, much less any harm stemming from gross negligence, willful misconduct, or fraudulent breach of a duty.

55. The language of the Lease Agreement, including Paragraph 23.9, does not effectively waive California Code of Civil Procedure § 1179 or California Civil Code § 3275.

56. The language of the Lease Agreement does not effectively waive the Court's general equitable power to relief the Debtor from forfeiture.

**REQUESTED RELIEF**

57.　The Debtor requests that the Court determine that the automatic stay applies to the Debtor's leasehold interest in the Lease.

58.　The Debtor further requests that the Court enforce the automatic stay against the Landlord. Specifically, the Debtor requests that the Court determine that the Landlord's continued treatment of the Lease as terminated will be a willful violation of the automatic stay.

59.　The Debtor contends that it and the estate have been damaged, and will be damaged, by the Landlord's past treatment of the Lease as terminated and violations of the automatic stay.

60.　Nevertheless, the Debtor has determined that prompt entry of a final order will provide greater relief than risk entry of an arguably interlocutory order that contemplates a future evidentiary hearing. Accordingly, the Debtor intends to waive damages if, and only if, an order granting this motion is entered.

**NOTICE**

61.　Notice of the hearing on this motion will be given: (a) by First-Class U.S. Mail and email to (i) Nimitz Group, LLC, (ii) Lind Marine, LLC, and (iii) the twenty largest unsecured creditors; (b) by email to (i) the United States Trustee and (ii) all secured creditors; (c) by First-Class U.S. Mail to (i) the Internal Revenue Service, (ii) the California Franchise Tax Board, (iii) the United States Attorney, and (iv) the United States Department of Justice; and (d) by CM/ECF electronic service to parties requesting special notice. Copies of the Motion and other documents will be served upon the foregoing, by the foregoing methods, to the extent required by the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure. The Debtor submits that, in light of the circumstances, no other or further notice need be given.

**PRAYER FOR RELIEF**

WHEREFORE, the Debtor prays for entry of an order:

1.　Determining that the automatic stay applies to the Debtor's leasehold interest in the Lease;

62.　Determining that the Landlord's continued treatment of the Lease as terminated will constitute a willful violation of the automatic stay; and

2. For such other and further relief as is appropriate in the premises.

Dated: March 1, 2026    BINDER MALTER HARRIS & ROME-BANKS LLP

By: /s/ *Reno Fernandez*
    Reno Fernandez
    Proposed Attorneys for Debtor in Possession,
    Mare Island Dry Dock, LLC